UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


LAMONT STERLING JOHNSON,

                    Petitioner,                         No. C 07-4483 PJH (PR)

        vs.                                             **ORDER DENYING PETITION
                                                        FOR WRIT OF HABEAS
ROBERT HOREL, Warden,                                   CORPUS AND GRANTING
                                                        CERTIFICATE OF
                    Respondent.                         APPEALABILITY**
_____/

        This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

2254.  The court ordered respondent to show cause why the writ should not be granted.

Respondent has filed an answer and a memorandum of points and authorities in support of

it, and has lodged exhibits with the court.  Although he was granted an extension of time to

do so, petitioner has not filed a traverse.  For the reasons set out below, the petition is

denied.

                                        **BACKGROUND**

        A Contra Costa County jury convicted petitioner of first degree murder with special

circumstances and robbery.  He was sentenced to prison for a term of life without the

possibility of parole.  The California Court of Appeal affirmed his conviction and the

California Supreme Court denied review.  *See People v. Johnson*, No. A103544, 2006 WL

1349345 (Cal. Ct. App. 2006); Ex. H.[1]

///

_____

        [1]  Citations to "Ex." are to the exhibits making up the record lodged with the court by
respondent.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

The following facts are excerpted from the opinion of the California Court of Appeal:

On May 28, 1996, at approximately 4:20 p.m., Roy Loewenfels, an East Bay Municipal Utility District ranger, was on duty at a trailhead at the Bear Creek staging area, several miles north of Lafayette.  While parked in one of the lots, Loewenfels heard six to eight gunshots and then saw two men coming into the parking lot from the trail area.  Loewenfels described the men as "jovial."  One of the men ran towards Loewenfels and fired several shots that hit his vehicle and nearly struck him.  Loewenfels was forced to hide behind his truck.  The men then drove away in two cars-a small blue station wagon and a white two-door sports car.  Loewenfels was unable to identify any of the persons involved.

When the police arrived, they discovered the body of a white male, later identified as 21-year-old Stephen "Snoo" Harless, who had been shot multiple times.  Harless was a drug dealer who had provided marijuana to members of a criminal street gang known as All Kickin' It Posse (hereafter AKP). [Petitioner] and his codefendant, Lemar Harrison, were AKP members, and [petitioner] had suggested robbing Harless to other AKP members on more than one occasion.  On the morning of the murder, [petitioner] and codefendant Harrison met at the apartment of another AKP member, Alex Wada.  The prosecution's theory was that an agreement was made that [petitioner] and Harrison would meet Harless later that day for the ostensible purpose of buying marijuana.  The real plan that day, however, was to rob and kill Harless because "[t]hey know that if he comes up alive, he'll tell who did it.... They know he can identify."

The jury was read certain portions of codefendant Harrison's testimony from a prior proceeding.[2]  Harrison denied he was part of a plan to rob and/or murder Harless, and he had no idea that there was going to be a fatal shooting on May 28, 1996, when he and [petitioner] met Harless.  Harrison testified he was "shocked" and "stunned" when [petitioner] pulled out a gun and shot Harless several times.  [Petitioner] then handed the gun to Harrison and told him to shoot Harless.  Harrison fired a shot at Harless, who was lying on the ground.  [Petitioner] and Harrison ran back to the parking lot, where they came upon Loewenfels sitting in his truck.  At [petitioner]'s urging, Harrison fired the gun several times at the truck.

Eyewitness evidence revealed that at this point, [petitioner] and Harrison fled-Harrison in Harless's white two-door sports car, and [petitioner] in the blue station wagon.  A Pinole assistant chief fire marshal, Jim Parrot, was in the area and heard the radio broadcast describing the vehicles involved in the shooting.  Upon seeing the white sports car traveling at a high rate of speed, he gave chase.  During the pursuit, he was able to observe both the white sports car and the small blue station wagon stop next to each other as the drivers had a conversation.  Both of the drivers were able to elude capture, although Parrott eventually found the blue car abandoned with the driver door open.  The abandoned blue 1977 Toyota station wagon was

_____

    [2] [Footnote renumbered.]  [Petitioner] and his codefendant Harrison were tried separately.  On February 2, 2000, in a nonjury trial, Harrison was convicted of robbery with use of a firearm and first degree murder.  On September 15, 2000, Harrison was sentenced to prison for an indeterminate term of 25 years to life.  His conviction has been affirmed by this division in an unpublished opinion filed August 22, 2002 (*People v. Harrison* (A092690)).

2

registered to [petitioner].

The robbery netted a substantial amount of marijuana and large amount of cash.  After escaping, Harrison went back to Wada's apartment, driving Harless's white RX-7 sports car.  Harrison told Wada he had "ganked [robbed] some dude."[3]  Wada helped Harrison retrieve two backpacks filled with marijuana from Harless's car.  Later, some of Harless's clothes were found on the side of Wada's house.

Harrison then took [petitioner] to Khari Reichling's house.  Reichling had known Harrison since 1994, when Reichling's mother lived with Harrison's father. They brought a large quantity of cash and bags of marijuana with them. Reichling testified he "had never seen that much [marijuana] in my life." [Petitioner] showed Reichling's roommate, Leroy Brock, a semiautomatic handgun.  Brock testified that [petitioner] told him that it "shoots nice."  The next day, Reichling and [petitioner] went to pick up Harrison at his girlfriend's house.  However, the police were there and arrested [petitioner], who had the semiautomatic handgun on the floor of the car near where he was sitting. Ballistics revealed that the gun in his possession was the same gun used to kill Harless.[4]  When arrested, [petitioner] possessed $505 in cash, even though he was unemployed at the time.

[Petitioner], who was 19 years old at the time of the crime, testified on his own behalf.  He admitted that he was present with Harrison at the scene of the murder, but claimed that Harrison had only told him that they were going to hang out with "Snoo" and smoke marijuana.  [Petitioner] insisted he did not plan to rob Harless nor did he participate in the robbery or shooting, which he claimed were both done solely by Harrison.

The jury was instructed on both premeditated/deliberate first degree murder and felony-murder, with robbery as the underlying felony.  The jury convicted [petitioner] of murder, set the degree at first degree, and found that the murder "was committed while defendant ... was engaged in the commission and attempted commission of, or the immediate flight after committing or attempting to commit, Robbery...."  The jury also found [petitioner] guilty of robbery.  Each of the firearm arming allegations was found true.

*Id.* at *1-3.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on

---

[3]  [Footnote renumbered.]  Wada was declared an unavailable witness, and his testimony in another proceeding was read to the jury.

[4]  [Footnote renumbered.]  It was stipulated that on May 29, 1996, the Santa Clara police found a .40-caliber Smith and Wesson semiautomatic handgun in a car near where [petitioner] was sitting.  It was determined to be the gun that was used to kill Stephen Harless on May 28, 1996.

United States District Court

For the Northern District of California

the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

4

**United States District Court**
For the Northern District of California

**DISCUSSION**

Petitioner asserts that: (1) the government destroyed exculpatory evidence; (2) his right to a defense and right to due process were violated by the trial court's refusal to give an instruction on destruction of evidence; (3) his Sixth and Fourteenth Amendment rights were violated by the prosecution's presentation of false evidence and by its use of inconsistent theories; (4) his Sixth and Fourteenth Amendment rights were violated when the trial court refused to allow an evidentiary hearing on the use of false testimony and inconsistent theories; (5) exclusion of evidence of the prosecutor's examination in a co-defendant's trial, which would have revealed the inconsistent theories, violated due process; (6) the trial court violated his rights by allowing rebuttal evidence by the prosecution that did not rebut anything in the defense case; (7) his rights were violated by admission of the circumstances of his attempted escape from jail; (8) admission of testimony from a gang expert violated petitioner's due process rights when there was no evidence other than the expert's own testimony that there was any gang involvement in the crime; (9) the prosecutor's misstatement of the law in closing violated due process; (10) the jury instruction saying that the jury did not have to agree unanimously on a theory of the murder violated petitioner's sixth amendment and due process rights; (11) the court's refusal to disqualify the prosecutor violated petitioner's rights; (12) the cumulative effect of the above errors made the trial fundamentally unfair; (13) petitioner's right to a jury drawn from a fair cross-section of the community was violated; and (14) the felony-murder provisions of California law are over-broad, so his sentence was cruel and usual and violated his due process and equal protection rights.  In the discussion below the court has combined issues six, seven, and eight under the heading "Admission of Evidence."

**I.    Destruction of Evidence**

**A.    Background**

The background for this issue was set out by the court of appeal:

> This is the second time [petitioner] has been convicted of these crimes. At the conclusion of [petitioner]'s first trial, on March 31, 1999, the jury found [petitioner] guilty of murder and robbery, with an arming enhancement, and

found a robbery-murder special circumstance true.  After conviction but before the penalty phase, defense counsel first learned, through counsel for [petitioner]'s codefendant, of material evidence that had never been disclosed to the defense.

Months of motions and procedural wrangling followed.  Finally, on December 13, 2000, after six days of evidentiary hearing, the trial court granted [petitioner]'s motion for a new trial.  The trial court based its ruling on law enforcement's failure to disclose material exculpatory evidence pursuant to *Brady v. Maryland* (1963) 373 U.S. 83.

There were several discovery violations that formed the basis for [petitioner] being granted a new trial.  Specifically, after [petitioner] was convicted in the first trial, the defense learned for the first time that the police and/or the prosecution had failed to divulge material evidence, including that 1) Harless had been in possession of a large sum of money, $15,000 to $30,000, shortly before his death that was never recovered; 2) Harless had a life insurance policy and that one of the beneficiaries had left for Mexico shortly after Harless's death; and 3) there were initial reports of a possible third suspect, a Caucasian male with blond hair.

In his reply brief, [petitioner] has clarified that the only discovery violation that is pertinent to this issue is the trial court's finding that law enforcement officials failed to disclose early press releases identifying a possible third suspect who was a Caucasian male with blond hair, and who may have been involved in, or witnessed, the murder.[5]  Consequently, given the parameters of this issue as defined by [petitioner], we confine our discussion to the pertinent facts surrounding this discovery violation.

*Johnson*, 2006 WL 1349345 at *3.

Here, as he ultimately did on direct appeal, petitioner presents only the issue regarding destruction of evidence of the third suspect.

The court of appeal continued:

By way of background, during the first trial, the trial court issued an order to the East Bay Regional Park District Police Department (hereafter EBRPD) to preserve all computer files relating to the Harless murder investigation.  In proving evidence had been destroyed, Darrell Lane, a computer consultant hired by the defense, examined the EBRPD office network server for files related to the Harless investigation.  On an old server, which had been disassembled in preparation for disposal, Lane found a press release by the EBRPD dated June 2, 1996.  The press release described two suspects as "Black male adults."  The press release further stated that "Detectives are trying to identify a possible third suspect."

The press release, along with all other Harless investigation files, was transferred to a new computer server in late 1997 or early 1998.  However, the file was modified on April 2, 1999, by someone using the unique user ID

---

[5]  [Footnote renumbered.]  [Petitioner] indicates in his opening brief that he and his codefendant Harrison "are young [B]lack men."

6

United States District Court

For the Northern District of California

and password of Detective Tim Anderson of the EBRPD, who was the lead investigator in the Harless murder investigation.  The modified file contained a "joke wanted" poster about an employee in the parks department.  The original press release of June 2, 1996, was overwritten and deleted.  The modification to the file occurred at 4:27 p.m., approximately three hours after the public defender's office sent a fax to the Contra Costa County District Attorney's Office, complaining of discovery violations in the trial of codefendant Harrison.[6]

The defense also located a press release by the EBRPD, dated May 30, 1996, which described two suspects: "Suspect one is described as a Black male adult, late teens to early twenties, no further.  Suspect two is described as a White male adult, late teens to early twenties with curly blonde hair."  The original of that press release was contained in Detective Anderson's file.  Detective Anderson did not author the press release and claimed not to know if it was actually released to the media.  Detective Anderson also claimed not to know the source of the information regarding the blond suspect, who was not mentioned in any of the police reports.

Yet more press releases surfaced that had not been disclosed to the defense.  In May 1996, Steven Abbors managed the East Bay Municipal Utility District watershed area.  On May 29, 1996, Abbors received two faxed press releases from the EBRPD regarding suspects involved in the murder.  In May 2002, after reading about this case in the newspaper, Abbors contacted the EBRPD and provided those faxed press releases.  On one press release was a handwritten description of a White male suspect with curly blond hair wearing a beanie.

The court found that evidence of a potential third suspect should have been disclosed to the defense.  More troubling, the court observed that "Detective Anderson has repeatedly denied not only the existence of a third person at the scene of the homicide but also that there was ever any information regarding a third person...."  In granting [petitioner] a new trial, the court found that the overwritten press release and the dismantled EBRPD network computer were "in total and complete disregard for this Court's order to preserve evidence."

Prior to the commencement of [petitioner]'s second trial, [petitioner] filed repeated motions to dismiss the charges, alleging that his Fifth, Eighth, and Fourteenth Amendment rights to due process and a fair determination of guilt was violated by the EBRPD's "bad faith destruction of exculpatory evidence" under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).[7]  After considering

---

[6] [Footnote renumbered.]  Detective Anderson admitted authoring the joke wanted poster. He denied intentionally saving the joke file over the press release from the Harless case.

[7] [Footnote renumbered.]  *Trombetta* and *Youngblood* present in-depth discussions of the constitutional duty to preserve physical evidence and the consequences of the destruction of evidence by law enforcement personnel.  Our Supreme Court has expressly adopted the holdings in *Trombetta* and *Youngblood*.  (*People v. Frye* (1998) 18 Cal.4th 894, 942-943; *People v. Zapien* (1993) 4 Cal.4th 929, 964 .)

United States District Court

For the Northern District of California

additional evidence, the trial court denied [petitioner]'s motion to dismiss the charges.  However, in fashioning an appropriate sanction, the court allowed [petitioner] to present evidence to the jury about the discovery violations and the undisclosed evidence about a third suspect.  The court found [petitioner] was also entitled to an instruction whereby the jury was told that they could consider the evidence of misconduct in determining the truth of the charges against him.

By [petitioner]'s own admission, during the second trial, "the issue of governmental misconduct was a central portion of his defense."  The defense presented numerous witnesses to testify about the suppression and/or destruction of evidence with respect to initial reports seeking a third suspect.  During closing argument, the defense argued extensively about the significance of the misconduct, and maintained that the information about the blond suspect had been deliberately suppressed by the police and prosecution.  The defense also argued that the blond suspect could have been an eyewitness who would have corroborated [petitioner]'s account of the murder.

Furthermore, the jury was instructed that if they believed the prosecution had "knowingly and willfully" failed to produce exculpatory evidence, the jury could, but was not required, to infer that other undisclosed exculpatory evidence existed.  The instruction further permitted the jury, if they determined that other exculpatory evidence may exist, to consider that fact in evaluating whether the prosecution proved the charges beyond a reasonable doubt.  The jury was further instructed that if they found a witness had knowingly failed to disclose evidence, they could find that witness was biased against [petitioner].[8]

Nevertheless, [petitioner] contends that the trial court's sanctions did not go far enough to remedy the discovery abuse in this case.  Even though [petitioner] was granted a new trial during which he was given great liberty to exploit the earlier discovery violations, he claims that under the reasoning in *Trombetta* and *Youngblood*, "the government's bad faith efforts to destroy evidence" required dismissal of the charges against him or, at the very least, suppression of the prosecution's most probative evidence.   We conclude, however, that the trial court did not abuse its """large measure of discretion"""  in determining that it would be inappropriate to impose such a drastic sanction. (*People v. Memro* (1995) 11 Cal.4th 786, 831; *People v. Zapien*, *supra*, 4 Cal.4th at p. 964.)

*Id.* at *4-5.

_____

[8]  [Footnote renumbered.] [Petitioner] requested that the trial court instruct the jury that: 1) they could draw an adverse inference from the prosecution's destruction of evidence; 2) they could presume the destroyed evidence was unfavorable to the prosecution's case; and 3) the destruction of evidence could be used by the jury as a circumstance tending to show [petitioner] was not guilty.    [Petitioner] claims the court erred in not giving his "defense-requested pinpoint" instruction; however, we find no error.  The jury was properly instructed on how to evaluate the evidence of the discovery violations in this case, and [petitioner]'s proposed instructions could properly by rejected as argumentative.  (People v. Wright (1988) 45 Cal.3d 1126, 1137, 1143.)

**B.   Analysis**

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489 (1984).  Failure to do so is a violation of due process. *Id.* at 488-89.  Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only *potentially* useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)

Although this issue took up a great deal of time in superior court, and resulted in a new trial of a lengthy capital case, the constitutional claim involved is not actually difficult to resolve.  The court of appeal, in ruling on the claim, noted that "[i]In denying [petitioner]'s motion to dismiss the charges, the court below astutely observed [that] the missing evidence "appears to have been all produced" and that there was "really no proof that [the [petitioner] has not] received everything of an exculpatory nature."  *Johnson*, 2006 WL 1349345 at *6.  The court of appeals agreed:

> The record bears out this observation.  The deleted press release referring to the possibility of a third suspect was eventually recovered from the junked computer server, and the circumstances surrounding its destruction and suppression were fully explored at trial.  Moreover, as [petitioner] acknowledges, "[o]nce that buried press release emerged, other press releases also came to light....  Thus, at trial, the defense was in possession of the press releases identifying a third blond young man seen at the scene."

*Id.*

That is, the state courts determined that by the time of the second trial the defense had the information it contended had been destroyed, though perhaps not all the physical evidence, and petitioner has not shown that the trial court's finding of fact that by the time of the second trial he had "received everything of an exculpatory nature" was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  That finding therefore is taken as established

**United States District Court**

For the Northern District of California

1    for purposes of this court's ruling.

2         In *Trombetta* the Court said that, in order to constitute a due process violation, the

3    destroyed "evidence must possess an exculpatory value that was apparent before the

4    evidence was destroyed, and *must also be of such a nature that the defendant would be*

5    *unable to obtain comparable evidence by other reasonably available means*."  *Trombetta*,

6    467 U.S. at 489 (emphasis added).  Here, petitioner was able to "obtain comparable

7    evidence by other means," as both the trial court and the court of appeal determined, and

8    petitioner has not made any showing to the contrary.  There thus was no due process

9    violation.  *See Olszewski v. Spencer*, 466 F.3d 47, 57-58 (1st Cir. 2006) (recognizing and

10   applying *Trombetta*'s "irreplaceability requirement"); *DiBenedetto v. Hall*, 272 F.3d 1, 12

11   (1st Cir. 2001) (admission of evidence comparable to that destroyed bars *Trombetta* claim).

12   **II.    Failure to Give Defense Instructions on Destruction of Evidence**

13        Petitioner contends that his right to a defense and right to due process were violated

14   by the trial court's refusal to give a proposed defense instruction on destruction of

15   evidence.

16        These were the instructions requested by the defense:

17                      Defendant's Special Instruction 9
18   If you find that the police/prosecution willfully withheld from the defense,
     information provided to the police shortly after the crime concerning a third
     person, and evidence of fifteen thousand dollars in cash that was in the
19   possession of Steven Harless shortly before his death you may presume that
     such evidence was unfavorable to the prosecution's case.

20
                        Defendant's Special Instruction 10
21   Employees of East Bay Regional Park Police and the prosecution have
     refused to disclose evidence in violation of a court order. Because of the
22   destruction of evidence after the Court issued a discovery order, you may
     draw an adverse inference to the Prosecution in the proof of counts 1 and 4
23   and the special circumstance allegation.

24                      Defendant's Special Instruction 11
25   If you find that the prosecution and/or police attempted to suppress evidence
     that would have pointed to Mr. Johnson's innocence this attempt may be
26   considered by you as a circumstance tending to show that Mr. Johnson is not
     guilty of the charged offenses.

27                      Defendant's Special Instruction 12
28   If you find that the police/prosecution willfully withheld evidence, you may
     draw an inference that there was something damaging to the prosecution's

case in the suppressed evidence.

### Defendant's Special Instruction 13

If you find that the police/prosecution attempted to/or did persuade a witness to testify falsely or attempted to fabricate evidence to be produced at trial, that conduct may be considered by you to show that Mr. Johnson is not guilty of the charged offenses.

### Defendant's Special Instruction 14

If you find that before this trial a prosecution witness, to wit, Detective Anderson, made a willfully false or deliberately misleading statement concerning evidence that the prosecution has attempted to use to show Mr. Johnson's guilt, you may consider that statement as evidence tending to prove that Mr. Johnson is not guilty of the charged offenses.

### Defendant's Special Instruction 15

Evidence has been presented that the police/DA intentionally withheld from the defense information about the description of [a] third party that was reported to police shortly after the crime. You may use the fact of this withholding to infer that the withheld information would have pointed towards Mr. Johnson's innocence as to the charged offenses. You may also infer that testimony by Detective Anderson and other members of the East Bay Regional Police Department and the prosecution team may be biased against Mr. Johnson.

Ex. A (clerk's transcript) at 6686-92.

These are the instructions the court gave:

Jury Instruction No. <u>29</u>

The United States Constitution, as well as the laws of the State of California, require the prosecution to disclose to the defense before trial any and all material "exculpatory evidence."  For this purpose, "exculpatory evidence" consists of either:

(1) Information, admissible at trial, which tends to show defendant is not guilty of the crimes charged or which tends to mitigate his or her culpability for those crimes; or

(2) Information which can reasonably be expected to lead to discovery of the kind of information related in (1), above, even though it may turn out not to do so.

In this case, evidence has been introduced which, if believed, tends to show that the prosecution knowingly and willfully failed to produce "exculpatory evidence", as above defined, to the defense before trial. More specifically, evidence has been introduced which, if believed, tends to show that the prosecution knowingly and willfully failed to produce:

(1) Certain press releases suggesting the prosecution had received information about a third party possibly being involved in the commission of the crimes herein charged; and

(2) Information from certain individuals that they had observed the victim shortly before the commission of the crimes herein charged with anywhere from $15,000 to $30,000 in his possession.

All of the foregoing information was ultimately discovered by the defendant and has been available to him for use at this trial. However, if you find that the prosecution knowingly and willfully failed to disclose any

"exculpatory evidence", you may – although you are not required to – infer from this that there may exist, or have existed, other "exculpatory evidence" not produced by the prosecution as required by the Constitution and the laws of this State.

If you find that there is a possibility that such additional "exculpatory evidence" exists or existed, you may then consider that in evaluating the evidence presented by either side at this trial and/or in determining whether the People have proven the truth of the charges beyond a reasonable doubt.

You may not, however, speculate as to what the nature of this additional exculpatory information, if any, is or may have been.

For purposes of this instruction, the term "prosecution" includes all law enforcement agencies investigating the crimes charged in this case, as well as the district attorney's office.

Jury Instruction No. 30

If you find that any witness in this case has knowingly and willfully failed to disclose 'exculpatory evidence' in this case, or has aided and abetted such conduct, you may also – but are not required to – infer that said witness is biased against the defendant and may consider that in evaluating the credibility of his or her testimony.

Jury Instruction No. 31

With regard to the last two instructions, the defendant has the burden of proving, by a preponderance of the evidence, that there were any knowing and willful failures to disclose 'exculpatory evidence.'

*Id.* at 6405-07.

The court of appeal rejected this claim in a footnote:

[Petitioner] requested that the trial court instruct the jury that: 1) they could draw an adverse inference from the prosecution's destruction of evidence; 2) they could presume the destroyed evidence was unfavorable to the prosecution's case; and 3) the destruction of evidence could be used by the jury as a circumstance tending to show [petitioner] was not guilty. [Petitioner] claims the court erred in not giving his "defense-requested pinpoint" instruction; however, we find no error. The jury was properly instructed on how to evaluate the evidence of the discovery violations in this case, and [petitioner's] proposed instructions could properly by rejected as argumentative. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137, 1143.)

*Johnson*, 2006 WL 1349345 at *5 n.10.

Federal habeas relief is available when an a jury instruction so infects the trial that the trial is rendered fundamentally unfair, in violation of petitioner's right to due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v.*

United States District Court

For the Northern District of California

*Frady*, 456 U.S. 152, 169 (1982).  Moreover, it is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case.  *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000)).  Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir.2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)).  However, the defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).  An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory.  *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).  In other words, it is necessary to determine whether what was given was so prejudicial as to infect the entire trial and so deny due process.  *Id.*

The key to this issue is that, as the trial court instructed the jury and as discussed above, the evidence that was known to have been "destroyed" was recovered and presented to the jury.  Petitioner did not show that there was other evidence that had been destroyed and not presented, in one form or another, at trial.  As a result, his proposed instructions are in essence an invitation to the jury to find petitioner not guilty or draw unfavorable inferences as a sanction for misconduct by the police.  Because the correct standard for due process claims involving instructions is whether the petitioner was denied a fair trial, and here petitioner has not shown that he was prevented from presenting all the actual evidence that bore upon his guilt or innocence, there was no fundamental unfairness and thus no due process violation.  This claim is without merit.

**III.    Prosecution's Use of Inconsistent Theories**

Petitioner contends that the prosecution convicted him using a different theory of the crime than that used to convict his codefendant Harrison at his separate trial, violating his Sixth Amendment and Fourteenth Amendment due process rights.

///

The court of appeal set out the background of this claim:

[Petitioner's] argument centers on the testimony of Paul Stelly, who first was a defense witness at codefendant Harrison's trial and then became a prosecution witness at [petitioner's] trial. [Footnote omitted.]

During codefendant Harrison's trial, Stelly was called as a witness for the defense to support the theory that [petitioner] acted alone in shooting and robbing Harless, and that any aid provided by Harrison was done under duress. Stelly testified that early in the summer of 1999 he met [petitioner] when they were both incarcerated in the Contra Costa County jail. Stelly sometimes acted as a "jail house lawyer," and [petitioner] sought Stelly's advice about his upcoming trial and the evidence against him. [Petitioner] said that he was being charged with murder and that when he was arrested, he had kicked the murder weapon under the seat of the car in which he was riding. [Petitioner] disclosed that there was another person involved, but [petitioner] admitted that he was the one who committed the murder. [Petitioner] expressed the belief that "he shouldn't have to go down by himself" and that his codefendant should take the rap because "his record was pretty clean."

Subsequently, Stelly was transferred to B Module where he met Harrison and realized Harrison was the other person [petitioner] spoke about. Stelly talked to Harrison's investigator, but he never contacted the prosecution or law enforcement with this information.

At codefendant Harrison's trial, the prosecutor attempted to discredit Stelly's testimony through cross-examination by questioning him about his arrest record and about the context in which [petitioner]'s statements were supposedly made. In his closing and rebuttal arguments in Harrison's trial, the prosecutor never mentioned Stelly or Stelly's testimony. However, the prosecutor argued that there was no corroboration for Harrison's testimony that [petitioner] was solely responsible for the robbery and murder, thereby implying that Stelly's testimony was not credible.

After hearing all of the evidence and arguments, the court found Harrison guilty of felony murder under an aiding and abetting theory. At a later stage in the proceedings, the court had an opportunity to explain its view of the evidence, stating "the evidence does not prove to me beyond a reasonable doubt that Mr. Harrison was the actual killer of Mr. Harless, or that he acted with intent to kill Mr. Harless." The court indicated it reached its verdict "by following an aider and abettor analysis."

After Harrison was convicted, [petitioner]'s second trial began and the prosecutor sought to present Paul Stelly as its own witness. [Petitioner] filed two pretrial motions with respect to Stelly. In one of the motions, [petitioner] asked for an evidentiary hearing "on the question of prosecutorial inconsistency" and moved to preclude Stelly's testimony because "in Lemar Harrison's trial the District Attorney attempted to show that Stelly's testimony was false." The other motion sought to introduce the prosecutor's cross-examination of Stelly at Harrison's trial. The trial court denied each of [petitioner]'s motions.

During the course of the extensive argument held on the admissibility of Stelly's testimony [Footnote omitted,] the prosecutor explained that he did

not know about Stelly during [petitioner]'s first trial and that he first learned about him when he testified for the defense at Harrison's trial. Moreover, the court's analysis of the evidence at Harrison's trial, finding Harrison guilty as an aider and abettor and exonerating him as the actual shooter, bolstered the prosecution's theory that [petitioner] was the actual shooter and gave more credence to Stelly's testimony. The court allowed the prosecution to call Stelly as its own witness, concluding that "it is difficult to see how there can be misconduct under these circumstances."

During its case-in-chief in [petitioner]'s trial, the prosecution called Stelly. Stelly testified, in conformance with his former testimony at Harrison's trial, that [petitioner] had told him that he had acted alone in killing Harless, but that his codefendant Harrison should "take the case" because [petitioner] had a worse record. In closing argument, the prosecutor briefly referred to Stelly's testimony as "a factor" but not a "crucial factor" in the prosecution's case against [petitioner].

[Petitioner] claims that it was an abuse of prosecutorial authority to argue "at codefendant Harrison's trial that Harrison was the actual killer, just as he argued in [petitioner]'s trial that [petitioner] was the actual killer." Moreover, in advocating these "irreconcilable theories," it was an abuse of prosecutorial authority to attempt to undermine Stelly's testimony in Harrison's trial and vouch for the truth of Stelly's testimony in [petitioner]'s trial. [Petitioner] claims that "the inconsistent theories violated [his] due process rights ... and requires dismissal of the charges or reversal of the convictions."

*Johnson*, 2006 WL 1349345 at *9-10.

After a careful discussion of a recent California Supreme Court case involving inconsistent prosecution theories, *In re Sakarias,* 35 Cal. 4th 140 (2005), the court of appeal analyzed petitioner's claim:

In our case, there was no concealment and deception practiced upon the jury, as there was by the *Sakarias* prosecutor. The evidence presented at the two trials, including Stelly's testimony, was basically the same. Also, here the prosecutor only presented the evidence in [petitioner]'s second trial, while the defense presented it in the Harrison trial. While *Sakarias* was the type of case "where the probable truth of the situation can be determined" from the physical evidence, on the record before us, the prosecutor had no way of knowing which version of the facts was true or false as there were several possible scenarios supported by reasonable inferences from the evidence. (*Sakarias, supra*, 35 Cal.4th at p. 164.) Consequently, as distinguished from *Sakarias*, [petitioner] cannot argue that any of the prosecutor's evidence or argument in his trial was based on a demonstrably false premise.

Also, unlike *Sakarias*, no mutually inconsistent, irreconcilable theories were used to convict [petitioner] and his codefendant. The result in Harrison's trial was predicated on the finding that [petitioner] fired the fatal shot, so the prosecutor's theory of the same crime in [petitioner]'s subsequent trial, and the use of Stelly's testimony to establish [petitioner] was the shooter, was totally consistent with the result of his codefendant's trial. In other words, there was no "'flip flopping of theories of the offense [which] was inherently

United States District Court

For the Northern District of California

unfair'...." (*Sakarias*, *supra*, 35 Cal.4th at p. 156, quoting *Drake v. Kemp* (11th Cir.1985) 762 F.2d 1449, 1479, conc. opn. of Clark, J.)

Significantly, the *Sakarias* court was careful to distinguish the facts in its case from those "in which the prosecutor's theories were held fundamentally consistent because any variation did not concern a fact used to convict the defendant or increase his or her punishment. [Citation.]" *(Sakarias*, *supra*, 35 Cal.4th at p. 161, fn. omitted.) As an example of the type of case where the prosecutor's use of inconsistent theories was not improper because it did not effect the outcome of the trials, the *Sakarias* court cited *Nichols v. Scott* (5th Cir.1995) 69 F.3d 1255 (*Nichols*), a case remarkably like our own. (*Sakarias*, supra, at p. 161, fn. 3.) In *Nichols*, the evidence showed that both defendants were acting together to commit an armed robbery, that both fired at the victim, that one of these shots was fatal, but it was not clearly established which defendant fired the fatal shot. *(Nichols*, supra, at p. 1271.) The court found that where the facts support the conclusion that either defendant could have fired the fatal shot, the prosecutor did not violate due process by arguing at separate trials that the man on trial was the one responsible. The court reasoned that the two theories advanced by the prosecution were not inconsistent because both defendants could have been convicted under the felony-murder rule. (*Id.* at ¶. 1270-1271.) [Footnote omitted.]

In seeking a murder conviction at the separate trials, the prosecutor proceeded not only on the theory that each defendant was the actual shooter, but also on theories of liability that implicated both men no matter who pulled the trigger, such as felony murder based on being an aider and abettor to robbery, and murder in furtherance of a conspiracy. Consequently, like *Nichols*, the core issue at each defendant's trial was not the identity of the shooter, and none of the differences in the two trials go to the prosecution's underlying theory of the case-which was that [petitioner] and Harrison committed the murder and robbery together and that no matter who fired the fatal shots, they were equally culpable.

We view the situation profiled in *Sakarias* as an exception to the right of the prosecution to rely on alternate theories in criminal prosecutions, even though the theories might appear inconsistent, so long as the theories are supported by consistent underlying facts and do not produce unfair results. (*See, e.g., People v. Watts* (1999) 76 Cal. App. 4th 1250, 1260-1261 [no due process violation where there was no evidence the prosecutor manufactured or manipulated the evidence even though the prosecutor secured identical convictions in separate trials for crimes that could only have been committed by one person].) Given this distinction, in the circumstances presented in this case, we find no due process violation.

*Johnson*, 2006 WL 1349345 at *12-13.

The Ninth Circuit has held that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime. *Thompson v. Calderon*, 120 F.3d 1045, 1058-59 (9th Cir. 1997) (en banc), *reversed on other grounds,* 523 U.S. 538 (1998). In

**United States District Court**
For the Northern District of California

*Thompson*, the court found that in the second trial of a codefendant the prosecutor manipulated evidence and witnesses and "essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial." *Id.* at 1057.  The court reasoned that the positions taken by the prosecutor were fundamentally inconsistent and violated due process because different defendants were charged in separate trials with the same murder that had been committed by one individual.  *See id.* at 1054-56.  That cannot be said where both defendants could be guilty of the same crime because of the nature of the crime.  *See Nguyen v. Lindsey*, 232 F.3d 1236, 1240-41 (9th Cir. 2000) (prosecution's theory was not inconsistent in any fundamental way where underlying argument at both trials was that under California law those who take part in gang warfare are equally responsible for the death of an innocent bystander); *cf. Shaw v. Terhune*, 380 F.3d 473, 479-80 (9th Cir. 2004) (declining to decide whether defendant's due process rights were violated when prosecutor advanced factually inconsistent argument at trial of codefendant; any error was harmless in light of the existence of sufficient evidence to convict defendant without implicating the factual tension).

There are four reasons why there was no due process violation in this case as a result of the prosecutor's handling of the two trials.  First, the *Thompson* rule turns on there being no significant new evidence, whereas here there was such evidence: the Stelly testimony, which the prosecutor did not know about until Stelly testified at the Harrison trial. It is true that after the Stelly testimony the prosecutor still argued that Harrison could be convicted as the shooter, as well on aiding and abetting or felony-murder theories, but of course the court (the case was tried to the court) could have disbelieved Stelly and concluded that Harrison was the shooter.  It did not, but given the state of the evidence it was reasonable for the prosecutor to argue all three theories.

Secondly, here, unlike in *Thompson*, the prosecutor did not twist and suppress evidence in order to claim that each defendant did something that only one could have done.  *Compare Thompson*, 120 F.3d at 1056 ("prosecutor presented markedly different and conflicting evidence at the two trials."), *with Johnson*, 2006 WL 1349345 at *12 ("The

United States District Court

For the Northern District of California

1  evidence presented at the two trials, including Stelly's testimony, was basically the same.").

2  The evidence here was the same in both trials, although the prosecution presented Stelly's

3  testimony in petitioner's trial and the defense presented it in Harrison's.  At bottom, the

4  *Thompson* standard is about a fair trial, 120 F.3d at 1059, and that the prosecutor did not

5  use different evidence, or skew it differently, in the two trials is a strong indicator that the

6  trial was not unfair.

7        Thirdly, as the court of appeal pointed out, the theories advanced by the prosecution

8  here were not fundamentally inconsistent.  Both defendants could be found guilty, even if

9  only one was the shooter, on aiding and abetting or felony murder theories.  And that is

10  what happened: at Harrison's trial the court based its conclusion on an aiding and abetting

11  theory and rejected the contention that Harrison was the shooter.  RT (Harrison) 3038-39.

12  If a variation or inconsistency does not result in inconsistent verdicts, there is no due

13  process violation.  *See Nguyen*, 232 F.3d at 1240-41 (no inconsistency when both

14  defendants could be found guilty of same crime on theory relied upon, even if only one

15  could have been the actual shooter).

16        Fourthly, this court can grant habeas relief on this question of law only if the state

17  court's decision was "contrary to, or involved an unreasonable application of, clearly

18  established Federal law, *as determined by the Supreme Court of the United States.*"  28

19  U.S.C. § 2254(d)(1) (emphasis added).  No clearly established Supreme Court authority

20  deals explicitly with whether a prosecutor's presentation of "inconsistent theories and facts,"

21  *Thompson*,  120 F.3d at 1058-59, can be a due process violation.  This claim thus relies

22  upon the more general right to a "fundamentally fair trial."  *See id.* at 1058 (citing *Lassiter v.*

23  *Department of Soc. Servs.*, 452 U.S. 18, 24-25, (1981); *Turner v. Louisiana*, 379 U.S. 466,

24  471-72 (1965); *In re Murchison*, 349 U.S. 133, (1955)).  That only this general principle is

25  "clearly established" means that the state courts have more "leeway" as to what is an

26  unreasonable result.  *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (if a legal rule

27  is specific, the range of reasonable judgment may be narrow; if it is more general, the state

28  courts have more leeway).

1    Given the factors discussed above, including the extra leeway afforded the state

2    courts when only a general principle is clearly established, it is clear that this claim is

3    without merit.

4    **IV.    Evidentiary Hearing**

5    Petitioner contends that his due process rights were violated by the trial court's

6    failure to hold an evidentiary hearing on the prosecutor's claim not to have known of Stelly's

7    evidence until Stelly testified at Harrison's trial.  The court of appeal disposed of this claim

8    in a footnote, saying:

9        The record reveals [petitioner] was provided an opportunity for full and fair
         litigation of his pretrial motions, and we have an adequate record to review.
10       (Compare *People v. Waidla* (2000) 22 Cal.4th 690, 745; *People v. Sakarias*
         (2000) 22 Cal. 4th 596, 635.)  Hence, we find the court did not abuse its
11       discretion in failing to hold an "evidentiary hearing" with respect to this claim.

12   *Johnson*, 2006 WL 1349345 at *10 n.13.

13   This court has determined above that the theories of the crime advanced by the

14   prosecution at the two trials were not fundamentally inconsistent, so even if there was

15   constitutional error in failing to hold an evidentiary hearing, that hypothetical error could not

16   have had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

17   *See Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507

18   U.S. 619, 638 (1993).  This claim is without merit.

19   **V.    Exclusion of Evidence**

20   The trial court refused to allow petitioner to introduce at his trial the transcript of the

21   prosecutor's cross-examination of Stelly at Harrison's trial.  Petitioner contended that they

22   were admissions of a party opponent.  He argues that this exclusion violated his due

23   process rights and his right to present a defense.

24   In ruling on this claim, the court of appeal said:

25       [Petitioner] next claims that even if due process "did not prevent the
         prosecutor from switching his position as to who was the actual shooter in this
26       case, [petitioner]'s Sixth and Fourteenth Amendment right to defend and
         fundamental principles of fairness required that the jury knew that the
27       prosecutor at one time believed something different from what he was
         currently arguing."  (Fn. and bolding omitted.)  Accordingly, [petitioner]
28       believes that, under the evidentiary rule which allows use of admissions by a

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   party-opponent (Evid. Code, § 1220), he should have been allowed to: 1)
2   introduce the prosecutor's cross-examination of Stelly from Harrison's trial;
    and 2) make the jury aware of the prosecutor's closing argument in Harrison's
3   trial in which he urged the jury to find Harrison was the shooter.

4           The trial court here did not abuse its discretion in refusing to admit this
    evidence.  In briefing this issue, [petitioner] has failed to cite any California
5   authority that applies the doctrine of party admissions to a prosecutor's
    closing argument or cross-examination in a criminal case, and our
6   independent research has failed to uncover any.  As [petitioner] points out, a
    number of cases in federal courts have endorsed the admission of
7   prosecutors' statements in related cases as party admissions.  (See, e.g.,
    *U.S. v. DeLoach* (11th Cir.1994) 34 F.3d 1001, 1005-1006 (*DeLoch*); *United*
8   *States v. McKeon* (2d Cir.1984) 738 F.2d 26, 33 (*McKeon*).)  In *McKeon*, the
    court said that statements of a defendant's attorney in a criminal case are
9   admissible in a subsequent trial as an admission of a party opponent where
    they are: 1) "assertions of fact" that are the "equivalent of [a] testimonial
10  statement[ ] by the [client]"; and 2) "inconsistent with similar assertions in a
    subsequent trial."  (*McKeon*, *supra*, 738 F.2d at p. 33; accord, *DeLoach*,
11  *supra*, 34 F.3d at p. 1005; see also *U.S. v. Salerno* (2d Cir 1991) 937 F.2d
    797, 811, rev'd. on other grounds (1992) 505 U.S. 317, 322.)

12          However, the *McKeon* court carved out an important limitation to
13  admissibility for "[s]peculations of counsel, advocacy as to the credibility of
    witnesses, arguments as to weaknesses in the [opponent's] case or
14  invitations to a jury to draw certain inferences...."  (*McKeon*, supra, 738 F.2d
    at p. 33.)  The court concluded that these types of statements were not
15  statements of fact equivalent to testimonial statements by the client but
    instead was advocacy regarding witness credibility and inferences to be
16  drawn from the evidence. *McKeon* cautioned against treating statements
    made during prosecutorial advocacy as admissions against the government.
17  "The prosecutor, after all, [is] neither a participant nor a witness, and has no
    knowledge of the facts other than those gleaned from the witnesses and other
18  available evidence.  Thus, the prosecutor's argument is not that a particular
    set of facts is the true set of facts; but that the evidence shows that a
19  particular set of facts is the true set of facts."  (*People v. Watts*, supra, 76
    Cal. App. 4th at p. 1263.)

20          Consequently, we believe the trial judge did not abuse his discretion in
    ruling the prosecutor's statements during cross-examination and closing
21  argument inadmissible.  During these portions of Harrison's trial, the
    prosecutor was engaged in "advocacy as to the credibility of witnesses," and
22  invited the "jury to draw certain inferences," two circumstances under which
    *McKeon* expressly stated an attorney's comments should not be admissible in
23  a subsequent, related proceeding.  (*McKeon*, supra, 738 F.2d at p. 33; see,
    e.g., *DeLoach*, supra, 34 F.3d at ¶. 1005-1006 [affirming a lower court's
24  decision to exclude statements made by an attorney during closing
    arguments]; *People v. Cruz* (Ill. 1994) 643 N.E.2d. 636, 664-665 [upholding a
25  lower court's decision that prevented the defense from introducing the
    prosecution's strategy in an earlier related trial because of competing policy
26  concerns]; *People v. Morrison* (Ill. App. Ct.1988) 532 N.E.2d 1077, 1088
    [refusing to admit the prosecutor's closing arguments in a codefendant's
27  trial].)

28  *Johnson*, 2006 WL 1349345 at *13-14.

United States District Court

For the Northern District of California

1    "State and federal rulemakers have broad latitude under the Constitution to establish

2    rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324

3    (2006) (quotations and citations omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42

4    (1996) (holding that due process does not guarantee a defendant the right to present all

5    relevant evidence).  This latitude is limited, however, by a defendant's constitutional rights

6    to due process and to present a defense, rights originating in the Sixth and Fourteenth

7    Amendments.  *Holmes*, 547 U.S. at 324.  "[A]t times a state's rules of evidence cannot be

8    mechanistically applied and must yield in favor of due process and the right to a fair trial."

9    *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of

10   its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of

11   trustworthiness and was critical to the defense violated right to present evidence).

12        In deciding if the exclusion of evidence violates the due process right to a fair trial or

13   the right to present a defense, the court balances the following five factors: (1) the

14   probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether

15   it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue

16   or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.

17   *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988,

18   994 (9th Cir. 1985)).  The court must also give due weight to the state interests underlying

19   the state evidentiary rules on which the exclusion was based.  *Chia*, 360 F.3d at 1006;

20   *Miller*, 757 F.2d 988, 995 (9th Cir. 1985).

21        Here, the cross-examination of Harrison and the prosecutor's closing argument at

22   his trial (1) had little probative value, because the prosecutor was only performing his role

23   of presenting argument and testing the veracity of a witness; (2) had little reliability, for the

24   same reason; (3) would not be easily evaluated by the jury, which would not be familiar with

25   litigators' professional standards and practices; (4) was cumulative; and (5) was a

26   moderately important part of the defense strategy of attacking the prosecution.  It is obvious

27   from these considerations that the balance tips strongly in favor of there having been no

28   violation of due process or of petitioner's right to present a defense.

United States District Court

For the Northern District of California

1   This is consistent with the holdings in *McKeon* and *DeLoach*, the cases cited by

2   petitioner, although in each of those cases the result was based on the Federal Rules of

3   Evidence and the court's supervisory authority, not the Constitution.  *See McKeon*, 735

4   F.2d at 30-34; *DeLoach*, 34 F.3d at 1005-06.  In each case the court said that admissibility

5   does not extend to "speculations of counsel, advocacy as to the credibility of witnesses,

6   arguments as to weaknesses in the [opponent's] case or invitations to a jury to draw certain

7   inferences . . . ."  *McKeon*, 735 F.2d at 33; *see also DeLoach*, 34 F.3d at 1005.

8   This claim is rejected.

9   **VI.   Admission of Evidence**

10   Petitioner claims that his due process and fair trial rights were violated when the trial

11   court (1) admitted evidence that he attempted to escape from jail; (2) allowed the

12   prosecution to introduce evidence that gunshot residue was found on his clothing; and (3)

13   allowed an expert to testify about the gang to which he belonged.

14   **A.   Standard**

15   The admission of evidence is not subject to federal habeas review unless a specific

16   constitutional guarantee is violated or the error is of such magnitude that the result is a

17   denial of the fundamentally fair trial guaranteed by due process.  *Henry v. Kernan*, 197 F.3d

18   1021, 1031 (9th Cir. 1999).  *But see Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.

19   2009) (Supreme Court "has not yet made a clear ruling that admission of irrelevant or

20   overtly prejudicial evidence constitutes a due process violation sufficient to warrant

21   issuance of the writ;" trial court's admission of irrelevant pornographic materials was

22   "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable

23   application of, clearly established Federal law under § 2254(d)).  But "[b]eyond the specific

24   guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.

25   [The Supreme Court therefore has] defined the category of infractions that violate

26   'fundamental fairness' very narrowly."  *Dowling v. United States*,   493 U.S. 342, 352

27   (1990).

28   Failure to comply with state rules of evidence is neither a necessary nor a sufficient

22

1   basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031;

2   *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state

3   evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is

4   certainly possible to have a fair trial even when state standards are violated; conversely,

5   state procedural and evidentiary rules may countenance processes that do not comport

6   with fundamental fairness. *Jammal*, 926 F.2d at 919 (citing *Perry v. Rushen*, 713 F.2d

7   1447, 1453 (9th Cir. 1983). Only if there are no permissible inferences that the jury may

8   draw from the evidence can its admission violate due process, however. *Id.* at 920.

9       **B.   Gunshot Residue**

10      Petitioner contends that evidence of gunshot residue found on the cuff of his shirt

11  was erroneously admitted during the prosecution's rebuttal case. The court of appeal

12  explained the context:

13          [Petitioner]'s next evidentiary claim is that the trial court abused its
        discretion in allowing the prosecution to introduce evidence establishing that
14      one particle of gunshot residue was found on the right cuff of [petitioner]'s
        shirt. This evidence was admitted, over [petitioner]'s objection, in rebuttal to
15      [petitioner]'s testimony that he was nowhere near the gun when Harrison fired
        it, killing Harless. [Petitioner] claims that "[w]hat the evidence tended to prove
16      was that [petitioner] was the shooter, and thus was a material part of the
        prosecution's case that should have been introduced in the case-in-chief."

17          In making this argument, [petitioner] principally relies upon *People v.*
18      *Carter* (1957) 48 Cal.2d 737. In that case, our Supreme Court stated "proper
        rebuttal evidence does not include a material part of the case in the
19      prosecution's possession that tends to establish the defendant's commission
        of the crime. It is restricted to evidence made necessary by the defendant's
20      case in the sense that he has introduced new evidence or made assertions
        that were not implicit in his denial of guilt. [Citations.]" (*Id.* at ¶. 753-754.)
21      Restrictions are imposed on rebuttal evidence to: 1) ensure the presentation
        of evidence is orderly and avoids confusion of the jury; 2) prevent the
22      prosecution from unduly emphasizing the importance of certain evidence by
        introducing it at the end of the trial; and 3) avoid "unfair surprise" to the
23      defendant from confrontation with crucial evidence late in the trial. (*People v.*
        *Bunyard* (1988) 45 Cal.3d 1189, 1211; *People v. Carter*, supra, 48 Cal.2d at
24      ¶. 753-754.)

25          The trial court did not abuse its discretion in allowing the prosecution to
        introduce the gun residue evidence on rebuttal despite [petitioner]'s
26      contentions that the prosecution could have presented the evidence as part of
        its case-in-chief. The prosecutor explained that he did not introduce the
27      gunshot residue evidence in his case-in-chief because he believed the
        evidence added very little to the prosecution's case. Gunshot residue was
28      described as being very fragile and falling off "like pepper." Consequently, it

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

may be deposited in many ways, and is easily transferred from item to item. Originally, the prosecutor did not feel the gunshot residue evidence was very important because there were too many ways the defense could explain away this evidence.  Its probative value was diminished because [petitioner] admitted being at the scene at the time of the shooting, and the evidence showed he was in possession of the murder weapon after Harless was killed. Accordingly, while the gunshot residue evidence could have been presented as part of the prosecution's case-in-chief, there was no compelling reason for the prosecution to have done so.  (See *People v. Carrera* (1989) 49 Cal.3d 291, 322-323.)

    The evidentiary equation changed when [petitioner] took the stand and testified that he was not in close proximity to Harrison when he shot Harless. After presentation of this evidence, the prosecution could reasonably conclude the gunshot residue evidence increased in probative value because it tended to impeach [petitioner]'s testimony that he was not in close proximity to the shooter.

    Thus, the trial court did not abuse its discretion when it permitted the prosecution to use the gunshot residue evidence in rebuttal, even though it was known to the prosecution before trial and could have been used during the prosecution's case-in-chief.  "Testimony that repeats or fortifies a part of the prosecution's case that has been impeached by defense evidence may properly be admitted in rebuttal.  [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)  Moreover, when all of the evidence is taken into account, the gunshot residue evidence was insignificant when compared to the other evidence establishing [petitioner]'s guilt.  Therefore, the prosecutor did not "sandbag" [petitioner] by intentionally holding back crucial evidence more appropriately presented in its case-in-chief in an effort to give that evidence greater emphasis.  (*People v. Carter*, supra, 48 Cal.2d at ¶. 753-754; accord, *People v. Carrera*, supra, 49 Cal.3d at ¶. 322-323.)  On this record, we find no abuse of discretion in permitting the rebuttal testimony.

*Johnson*, 2006 WL 1349345 at *17-18.

Petitioner does not explain his argument as to this issue in his petition, but the issues presented in this petition are the same as those he raised on appeal, so his brief on appeal provides guidance.  *See* Ex. C.  In it this issue is presented almost entirely in state-law terms, but in his discussion of whether the purported error was prejudicial, he says "where highly prejudicial evidence with no probative value is admitted, the defendant's federal due process rights are violated."  *Id.* at 107.  The cases cited in support are *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), the holding of which he summarizes as "where highly prejudicial evidence with no probative value is admitted, the defendant's federal due process rights are violated," and *Estelle v. McGuire*, 502 U.S. 62 (1991), the holding of which he characterizes as being "state law errors that render a trial

1    fundamentally unfair violate federal due process." Ex. C at 107.

2         As discussed above, the "fundamentally unfair" standard petitioner quotes from

3    *Estelle* is the correct standard.  And the quoted portion of *McKinney* is no more than a

4    specific application of the "fundamentally unfair" standard – that is, of course admission of

5    evidence that is *highly* prejudicial and has *no* probative value is fundamentally unfair.  *See*

6    *McKinney*, 993 F.2d at 1384.

7         It is clear there was not a due process violation.  First, the gunshot residue was

8    highly probative.  Secondly, petitioner has not identified any evidence that he would have

9    put on in his case in chief had the gunshot residue been introduced earlier, rather than in

10   rebuttal, and of course he had the same opportunity to cross-examine as he would have

11   had if the evidence had been introduced earlier.  As a result, admission of the evidence in

12   rebuttal could not have been fundamentally unfair.  This claim is without merit.

13        **C.    Escape Attempt**

14        Petitioner contended on direct appeal that "[t]he trial court violated [petitioner's]

15   federal constitutional rights to due process and a fair trial by the admission of irrelevant but

16   highly prejudicial evidence of the underlying facts of violence relating to [petitioner's]

17   escape attempt charge as impeachment when the fact of the escape had already been

18   introduced into evidence." Ex. C at 110.  He reasserts the claim here.

19        In 1999, after the guilty verdict in petitioner's first trial, Robert Croswell, a guard at

20   the Martinez detention facility, was checking the cell that housed petitioner and another

21   prisoner.  *Johnson,* 2006 WL 1349345 at *19.  He discovered that the metal grating over

22   the window had been "peeled back," nearly enough to allow passage of a person.  *Id.*

23   Croswell left the cell and attempted to close the door, but petitioner blocked it with his foot.

24   *Id.*  Petitioner and his cellmate followed Croswell, ignoring his orders to return to their cell.

25   *Id.*  When Croswell reached the deputy station and picked up a telephone, [petitioner] said,

26   "Don't make that call."  As Croswell continued dialing, [petitioner] said, "Now it's on.  Now, I

27   got to kill you."  *Id.*  Croswell ran, with petitioner in pursuit, until additional guards arrived

28   and subdued petitioner.  *Id.*

United States District Court

For the Northern District of California

1    The court of appeal discussed only the state law aspects of this claim, holding that

2    the evidence was relevant to petitioner's credibility, that its probative value was not

3    outweighed by its prejudicial impact, and that in any event admission of the evidence was

4    not prejudicial in view of the other evidence already admitted going to credibility. *Id.* at *20-

5    21.

6    Only if there are no permissible inferences that the jury may draw from the evidence

7    can its admission violate due process. *Jammal*, 926 F.2d at 920.  As the court of appeal

8    determined, here there was a permissible inference the jury could draw from petitioner's

9    misconduct, namely that he was not credible.  The jury could properly conclude that

10   someone who would risk trying to escape to avoid prison might also be willing to disregard

11   the oath and testify untruthfully at trial to avoid prison.  Admission of the evidence was not

12   arbitrary or so unfairly prejudicial as to render the trial fundamentally unfair.

13   **D.    Gang Expert**

14   Petitioner contends that admission of testimony from a gang expert violated his due

15   process rights when there was no evidence of gang involvement in the crime other than the

16   expert's own testimony.

17   The court of appeal set out the facts on which the claim is based:

18   The prosecution was allowed to call Sue Ellen Todd, a former Hercules
     police officer, to testify about the AKP and its criminal activities.  [FN15.

19   Because gang membership, activities, dynamics and motivations are beyond
     the common experience and knowledge of jurors, gang evidence is a proper

20   subject for expert testimony.  (*People v. Gardeley* (1996) 14 Cal.4th 605,
     617.)]  Todd had spent hundreds of hours investigating the AKP, including

21   investigating crimes committed by AKP members.  She also testified she had
     come into contact with AKP members over 50 times.  [FN16.  Despite

22   [petitioner]'s argument to the contrary, Todd's testimony was based on
     reliable evidence such as Todd's "'personal observations of and discussions

23   with gang members as well as information from other officers and the
     department's files.' [Citation.]" (*People v. Olquin* (1994) 31 Cal. App. 4th 1355,

24   1370.)]  Todd was allowed to testify that [petitioner] and Harrison were
     members of the AKP at the time of the crime and that the AKP had been

25   involved in prior robberies, shootings, carjackings and marijuana sales.
     [FN17.  We must emphasize here that [petitioner] does not claim that the

26   prosecution revealed [petitioner]'s gang affiliation through Todd's testimony.
     Other witnesses had already testified that [petitioner] was an AKP member,

27   and, as [petitioner] acknowledges, made Todd's testimony on this point
     cumulative.]

28

26

1
2
3
4
5

> Over [petitioner]'s objection, the court found that the above information was relevant on the question of identity. The court reasoned that since identity was a disputed issue, evidence of [petitioner]'s AKP membership, along with evidence of AKP activities that bore some relationship to the charged crimes, tended to show that [petitioner], as opposed to a third party not having any ties to the AKP, was one of the perpetrators. Specifically, the court observed that the gang evidence was relevant "to show ... that this crime, the instant crime has all the earmarks of having been committed by someone involved with the AKP."

6   *Johnson,* 2006 WL 1349345 at *15.

7   The court of appeal once again discussed only the state law aspects of this claim. It

8   rejected petitioner's contention that the expert's testimony was the only evidence

9   suggesting a gang connection, pointing out, as indeed did the trial court, that the victim's

10  marijuana ended up in the hands of gang members, some of which they sold. *Id.* at *16.

11  The court also noted that the perpetrators knew the victim through the gang, that the victim

12  provided marijuana to gang members, that petitioner had discussed robbing the victim in

13  the presence of gang members, and that the perpetrators had met at a gang member's

14  house before and after the killing. *Id.* It held that the trial court was correct that the

15  evidence was relevant to identity, and that in addition the evidence went to the credibility of

16  witnesses who were gang members. *Id.* at *17. The court of appeal also held that

17  although the gang evidence was "inflammatory," it was not an abuse of discretion for the

18  trial court to conclude that its probative value was not substantially outweighed by its

19  prejudicial nature. *Id.* at *16-17.

20  Only if there are no permissible inferences that the jury may draw from the evidence

21  can its admission violate due process. *Jammal*, 926 F.2d at 920. As the court of appeal

22  determined, here there was a permissible inference the jury could draw from the expert's

23  testimony, namely that it was that an AKP member committed the crime, which in turn

24  made it more likely that it was petitioner who committed the crime. It also was not

25  fundamentally unfair to admit expert testimony, admissible under state law, that helped the

26  jury understand the gang's connection to the crime. There was no due process violation.

27  ///

28  **VII.    Prosecutorial Misconduct**

United States District Court

For the Northern District of California

1    Petitioner also contends that a misstatement of the law by the prosecutor in closing

2    argument violated due process.  The court of appeal held that the prosecutor's comment

3    was not, at least in context, a misstatement of California law.  *Johnson,* 2006 WL 1349345

4    at *23.  This determination as to California law is binding on this court.  *See Bradshaw v.*

5    *Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).  The prosecutor

6    thus did not misstate California law, and this claim has no merit.

7    **VIII.    Unanimity**

8    Petitioner contends that the jury instruction saying that the jury did not have to agree

9    unanimously on a theory of the murder violated his Sixth Amendment and due process

10   rights.

11   Here, "[t]he jury was instructed that as long as they agreed unanimously that

12   [petitioner] was guilty of first degree murder, they did not have to unanimously agree on

13   whether [petitioner] was guilty "of such crime by reason of being the actual perpetrator,

14   aider and abettor or conspirator, or by reason of principles of robbery felony murder."

15   *Johnson,* 2006 WL 1349345 at *23.  This is a correct statement of California law.  *Id.*

16   The Supreme Court has held that "different jurors may be persuaded by different

17   pieces of evidence, even when they agree upon the bottom line.  Plainly there is no general

18   requirement that the jury reach agreement on the preliminary factual issues which underlie

19   the verdict."  *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackman, J, concurring);

20   *see also Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (rule that jurors not required to

21   agree upon single means of commission of crime applies equally to contention they must

22   agree on one of alternative means of satisfying mental state element of crime).

23   The state appellate courts' rejection of this claim was not contrary to, or an

24   unreasonable application of, clearly established Supreme Court authority.

25   **IX.    Disqualification of Prosecutor**

26   Petitioner contends that the prosecutor suffered from a "conflict of interest" because

27   of his "personal hostility towards Petitioner, defense counsel and the court . . . ."  Pet. at 4.

28   He contends that as a result, the trial court's refusal to disqualify the prosecutor was a

**United States District Court**
For the Northern District of California

violation of his due process and fair trial rights.  *Id.*

The court of appeal set out the background:

> After [petitioner]'s motion for a new trial was granted, [petitioner] moved to recuse the Contra Costa County District Attorney's Office, or, in the alternative, Deputy District Attorney David Brown, who was the prosecutor in the first trial.  The motion was predicated on the following grounds: [petitioner] argued that Brown's misconduct throughout the proceedings, including his role in the suppression of evidence, rendered it impossible for [petitioner] to receive fair treatment if Brown remained on the case.  [Petitioner] also argued that Brown must be recused because he would be called as a witness at both the guilt and penalty phases.  As regards recusal of the Contra Costa County District Attorney's Office, [petitioner] argued that because Brown's supervisors had knowledge of Brown's misconduct, yet failed to take any remedial action, [petitioner] could not receive fair treatment if any prosecutor in the office handled the case.

> On December 31, 2001, the court denied [petitioner]'s motion, observing "[t]here have obviously been a lot of issues, mainly concerning discovery and items either not being turned over, items being turned over late, [and] difficulties in getting items that have been ordered actually in the hands of the defense.... But what the record does not reflect ... it does not reflect that there is a demonstrated animosity between-or by Mr. Brown in this case towards Mr. Johnson personally."  The court also noted that the remedy "for the type of discovery issues that have plagued this case" was to grant [petitioner] a new trial and impose other sanctions, not to recuse the district attorney's office or Brown personally.

*Johnson,* 2006 WL 1349345 at *7.

The United States Supreme Court has not decided whether there is a general due process right to a conflict-free prosecutor.  *See People v. Vasquez,* 39 Cal. 4th 47, 60 (Cal. 2006) ("Neither this court nor the United States Supreme Court has delineated the limitations due process places on prosecutorial conflicts of interest."); *Dick v. Scroggy*, 882 F.2d 192 (6th Cir. 1989) (inferring from *Morrison v. Olson*, 487 U.S. 654 (1988), that whether a prosecutor has "unique incentives to seek an indictment" may be immaterial from a constitutional standpoint, as long as the trial is fair).  *Cf. Marshall v. Jerrico*, 446 U.S. 238, 248-50 (1980) (stating in dictum that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions).  The courts of appeals are split.  *See, e.g., Wright v. United States*, 732 F.2d 1048, 1055, 1057-58 (2d Cir. 1984) (finding no due process violation when Assistant United States

United States District Court

For the Northern District of California

Attorney's wife (whom he met and married while investigating defendant) was political opponent of defendant, had urged authorities to investigate him, and had allegedly been assaulted, on another occasion, by defendant's associates; distinguishing pecuniary interests from non-pecuniary ones); *Ganger v. Peyton*, 379 F.2d 709 (4th Cir.1967) (finding due process violation from dual representation when prosecutor in criminal case for assault also represented wife in divorce proceedings based on same assault).  The only clearly established Supreme Court authority that can be applied here is, therefore, that criminal defendants are entitled to a fundamentally fair trial.  *Thompson*,  120 F.3d at 1058.

The so-called "conflict" is between the prosecutor's alleged hostility to petitioner and his duty to serve justice impartially, that is, a personal bias.  But even as to judges, "the United States Supreme Court has distinguished between "matters of kinship [and] personal bias," which "seem generally to be matters merely of legislative discretion," and a judge's "direct, personal, substantial pecuniary interest in reaching a conclusion against" a defendant, which deprives the defendant of due process. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).   As the court in *Vasquez* reasoned, any constitutional limits there may be on prosecutors' conflicts are necessarily less stringent than those that apply to judges, because the Supreme Court held in *Marshall* that "[t]he rigid requirements . . . designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity."  *Vasquez,* 39 Cal. 4th at 64 (quoting *Marshall v. Jerrico*, 446 U.S. 238, 248-49 (1980).

Petitioner's vague allegations as to personal animosity by the prosecutor, who is subject to a less stringent standard than are judges, therefore are insufficient to establish a due process violation.  And in any event, petitioner has pointed to nothing that would show he was prejudiced by the purported bias of the prosecutor.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (error is harmless and cannot support habeas relief unless it had a substantial and injurious effect or influence in determining jury's verdict).  This claim is without merit.

**X.      Cumulative Error**

**United States District Court**

For the Northern District of California

1    Petitioner alleges that his above claims, even if no one of them amounts to

2    constitutional error, establish that the trial as a whole was a violation of due process, i.e.,

3    he claims cumulative error.  But when there is no constitutional error, there is nothing to

4    cumulate.  *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Because the court has

5    concluded here that there was no constitutional error, there was nothing to cumulate.  This

6    claim is rejected.

7    **XI.    Fair Cross-Section**

8    Petitioner contends that his Sixth and Fourteenth Amendment rights to a jury drawn

9    from a fair cross-section of the community was violated.  He contends that Contra Costa

10   jury venires consistently contain an under-representation of African-Americans.

11   A criminal defendant has a constitutional right stemming from the Sixth Amendment

12   to a fair and impartial jury pool composed of a cross section of the community.  *See*

13   *Holland v. Illinois*, 493 U.S. 474, 476 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975);

14   *Duncan v. Louisiana*, 391 U.S. 145, 148-58 (1968).  The fair cross section requirement

15   applies only to the larger jury pool or venire and is not applicable to petit juries.  *See*

16   *Lockhart v. McCree*, 476 U.S. 162, 173-74 (1986); *Nevius v. Sumner*, 852 F.2d 463, 463

17   (9th Cir. 1988).

18   In *Duren v. Missouri*, 439 U.S. 357, 364 (1979), the Supreme Court held that to

19   establish a prima facie violation of the fair cross section requirement, a defendant must

20   show that "(1) the group alleged to be excluded is a 'distinctive' group in the community; (2)

21   that the representation of this group in venires from which juries are selected is not fair and

22   reasonable in relation to the number of such persons in the community; and (3) that this

23   under-representation is due to systematic exclusion of the group in the jury-selection

24   process."

25   The trial court concluded that the first two prongs of *Duren* were satisfied, but that

26   the claim failed on the third prong, i.e., petitioner had not shown that the

27   underrepresentation was "the product of systematic action on the part of the county."

28   *Johnson,* 2006 WL 1349345 at *25.

United States District Court

For the Northern District of California

1    On appeal, petitioner conceded that the facts of his claim – the manner of

2 summoning the venire – were essentially the same as the facts of *People v. Currie*, 87 Cal.

3 App. 4th 225 (2001), and that he was making essentially the same claims. *Johnson,* 2006

4 WL 1349345 at *25. The court of appeal therefore adopted the *Currie* reasoning and result;

5 the crucial findings were that "'[t]he procedures employed by the county to summon and

6 select persons for jury service are, according to the undisputed evidence, entirely

7 race-neutral'" and that "'the disparity in representation is attributable to the

8 disproportionately high rate of failure to appear by those summoned for service.'" *Id.*

9 (quoting *Currie*, 87 Cal. App. 4th at 237).

10    In short, petitioner concedes that he has only the underrepresentation of blacks to

11 support his claim. That is not enough to show "systemic exclusion," the third *Duren* prong.

12 *See Randolph v. California*, 380 F.3d 1133, 1141-42 (9th Cir. 2004) (showing of

13 underrepresentation of an identifiable group not alone enough to show systematic exclusion

14 under the third prong). This claim is without merit.

15 **XII.    Felony-Murder**

16    Petitioner contends that California's special circumstances statute is "overbroad," so

17 his sentence was cruel and unusual and violated his due process and equal protection

18 rights. *See* Cal. Penal Code § 190.2(a) (penalty for person convicted of first degree

19 murder is death or life imprisonment without possibility of parole if one or more of listed

20 special circumstances is found). A state criminal statute may be challenged as

21 unconstitutionally vague or overbroad by way of a petition for a writ of habeas corpus by a

22 prisoner convicted under the statute. *Vlasak v. Superior Court of California*, 329 F.3d 683,

23 688-90 (9th Cir. 2003).

24    Petitioner does not explain in his petition the basis for this claim, but it was raised on

25 direct appeal, so presumably he intends to claim here, as he did there, that "the statute is

26 overbroad because it 'fails to perform the constitutionally required narrowing function, thus

27 rendering his special circumstance finding under that statute invalid.'" *Johnson*, 2006 WL

28 1349345 at *26. He relies on Supreme Court cases dealing with vague or overbroad

United States District Court

For the Northern District of California

capital sentencing statutes.  The Supreme Court has described the holding of its landmark

case in the area, *Furrman v. Georgia*, 408 U.S. 238 (1972), as being "that where discretion

is afforded a sentencing body on a matter so grave as the determination of whether a

human life should be taken or spared, that discretion must be suitably directed and limited

so as to minimize the risk of wholly arbitrary and capricious."  *Gregg v. Georgia*, 428 U.S.

153, 189 (1976) (opinion of Justices Stewart, Powell, and Stevens).  As a result, the Court

requires that aggravating circumstances "genuinely narrow the class of persons eligible for

the death penalty and [] reasonably justify the imposition of a more severe sentence on the

defendant compared to others found guilty of murder."  *Zant v. Stephens*, 462 U.S. 862,

877 (1983).

The court of appeal rejected this claim, saying that it  was bound by California

Supreme Court cases holding that the felony-murder special circumstances statute is not

over-broad.  *See Johnson,* 2006 WL 1349345 at *26.

Petitioner was sentenced to life without parole, not death.  *Id.* at *1.  He does not

explain why he thinks this claim, grounded as it is on the application of the Eighth

Amendment to capital cases, has any relevance to his situation, but presumably it is

because he is challenging the statute as unconstitutional on its face.

A statute may be unconstitutional "on its face" or "as applied."  A successful

challenge to the facial constitutionality of a statute invalidates the statute itself whereas a

successful as-applied challenge does not render the statute itself invalid but only the

particular application of the statute.  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir.

1998).  In a typical facial challenge to the constitutionality of a statute, the challenger must

establish that no set of circumstances exists under which the statute would be valid.  *United

States v. Stevens*, 130 S. Ct. 1577, 1587 (2010).

In a capital case involving the aggravating circumstances of murder in the

commission of kidnaping and in the immediate flight from rape, the Ninth Circuit has held

that the California death penalty statute sufficiently narrows the category of defendants who

are death-eligible to meet federal constitutional standards.  *See Karis v. Calderon*, 283 F.3d

United States District Court

For the Northern District of California

1  1117, 1141 n.11 (9th Cir. 2002). In light of *Karis*, petitioner cannot establish that the statute

2  is unconstitutional under all circumstances. Construed as a facial challenge, the claim

3  therefore fails. And if construed as a challenge to the statue as applied, the cases upon

4  which petitioner relies are irrelevant because their reasoning is based on the Eighth

5  Amendment implications of the death penalty, and thus apply only to cases in which that

6  penalty was imposed. *See Furman*, 408 U.S. 188; *Godfrey v. Georgia*, 446 U.S. 420, 427

7  (1980); *Zant*, 462 U.S. at 972.

8     Petitioner has not established that the statute is overbroad, whether considered as

9  applied or on its face. This claim is without merit.

10                                    **APPEALABILITY**

11     The federal rules governing habeas cases brought by state prisoners require a

12  district court that denies a habeas petition to grant or deny a certificate of appealability

13  ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

14  2254.

15     A petitioner may not appeal a final order in a federal habeas corpus proceeding

16  without first obtaining a certificate of appealability (formerly known as a certificate of

17  probable cause to appeal). *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall

18  grant a certificate of appealability "only if the applicant has made a substantial showing of

19  the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate

20  which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has

21  rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

22  straightforward: the petitioner must demonstrate that reasonable jurists would find the

23  district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

24  *McDaniel*, 529 U.S. 473, 484 (2000).

25     Jurists of reason could find the court's ruling on issues one, two, and three, the

26  claims involving misconduct by the police and the prosecutor, debatable or wrong. A COA

27  therefore will be granted as to those issues only. It will be denied as to the other issues.

28                                     **CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. A Certificate of Appealability is **GRANTED** as to issues one, two and three; it is **DENIED** as to the other issues. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 12, 2010.                              _____
                                                        PHYLLIS J. HAMILTON
                                                        United States District Judge

P:\PRO-SE\PJH\HC.07\JOHNSON,L4483.RUL.wpd